kai
200 E Liberty St Lbby Unit 7760
Ann Arbor MI 48107
M: Nadja Yang <nadja@njy.dev>
C: tel:332.203.3124
also known as Chi, Plaintiff *pro se*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

San Francisco Division

| | |
|---|---|
| CHI,<br>*Plaintiff,*<br>v.<br>REGENTS OF THE UNIVERSITY OF MICHIGAN,<br>*Defendant.* | Case No. 3:26-cv-11021-EMC<br>The Honorable Edward M. Chen<br>**PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE**<br>Response to Order to Show Cause<br>ECF No. 14 (Oct. 27, 2026) |

The Court has ordered the Plaintiff "to show cause as to why this case should not be dismissed for lack of personal jurisdiction and/or improper venue, or at the very least why this case should not be transferred to the Eastern District of Michigan pursuant to § 1404(a)." ECF No. 14, at 2. The order states that, "[b]ased on the allegations in Ms. Yang's complaint, there does not appear to be personal jurisdiction over the University with respect to its denial of Ms. Yang's Michigan FOIA request," *id.* at 1, describes the records requested as records about "the terms on which the University of Michigan retained outside counsel [Barnes & Thornburg LLP] and the amounts [the University] disbursed to [counsel in conjunction with several bankruptcy related cases involving Ms. Yang and pending in the Northern District of California]," *id.* (alterations in original) (quoting Compl. ¶ 29), and reads the complaint's allegation of personal jurisdiction as "suggesting that there is personal jurisdiction because, at the time Ms. Yang's FOIA request was denied, the University's General Counsel Tiomthy [sic] G. Lynch was leaving the University for a new job at Stanford." *Id.* at 2 (citing Compl. ¶ 6). "Similarly, venue is a problem." *Id.*

## 1 Personal Jurisdiction

Count I is a claim under Rev. Stat. § 1979, 42 U.S.C. § 1983, that the Regents of the University of Michigan withheld from the Plaintiff a benefit Michigan extends to "all persons," Mich. Comp. Laws § 15.231(2), on the basis of her exercise of the right to petition. Compl. ¶¶ 30–37, at 18–21; ECF No. 12, at 7–12. The act sued upon is the University of Michigan's denial of August 24, 2026, signed by Tracey Piercecchi as "FOIA Coordinator": "Your request is denied pursuant to Section 13 (1) (v) of the Michigan Freedom of Information Act, which exempts from disclosure 'records or information relating to a civil action in which the requesting party and the public body are parties.'" Compl. ¶ 25, at 15; ECF No. 12-1, at 4–5. The request had asked for the engagement terms, invoices, and payment records of the University of Michigan's outside counsel in "four matters identified by their docket numbers in this Court and in the Bankruptcy Court of this District," Compl. ¶ 1, at 2, namely *In re Yang*, No. 26-30507 WJL (Bankr.

N.D. Cal.); *Yang v. Regents of the University of Michigan (In re Yang)*, No. 3:26-cv-07302-WHO (N.D. Cal.); *Yang v. Regents of the University of Michigan (In re Yang)*, No. 3:26-cv-07259-WHO (N.D. Cal.); and *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal.). Compl. ¶ 23, at 12–13. The exemption the denial invoked reaches "[r]ecords or information relating to a civil action in which the requesting party and the public body are parties," Mich. Comp. Laws § 15.243(1)(v), and the Regents applied it to the Plaintiff's participation in civil proceedings against the University, proceedings pending in this District, before this Court and before the bankruptcy judges who "constitute a unit of the district court." 28 U.S.C. § 151; Compl. ¶ 14, at 7–8.

### 1.1 Congress has prescribed the measure

A federal court's jurisdiction over the person of a defendant is a matter of positive law before it is a matter of due process. "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied," and "[t]here also must be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant." *Omni Capital International, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987). The First Congress confined the original process of its courts to their districts: "no civil suit shall be brought before either of said courts against an inhabitant of the United States, by any original process in any other district than that whereof he is an inhabitant, or in which he shall be found at the time of serving the writ." Act of Sept. 24, 1789, ch. 20, § 11, 1 Stat. 73, 79, https://www.govinfo.gov/content/pkg/STATUTE-1/pdf/STATUTE-1-Pg73.pdf; *Omni*, 484 U.S. at 108 ("At common law, a court lacked authority to issue process outside its district, and Congress made this same restriction the general rule when it enacted the Judiciary Act of Sept. 24, 1789, § 11, 1 Stat. 79."). The limit was a limit of legislation: "Congress might have authorized civil process from any circuit court, to have run into any state of the Union. It has not done so." *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 328 (1838). The acts adopting the forms of state process "adopt the form and modes of service, only so far

as the persons are rightfully within the reach of such process, and did not intend to enlarge the sphere of the jurisdiction of the circuit courts," *id.* at 330, so that a rule under which "a subject of England, or France, or Russia, having a controversy with one of our own citizens, may be summoned from the other end of the globe to obey our process, and submit to the judgment of our courts" could not be inferred from them, *Picquet v. Swan*, 19 F. Cas. 609, 613 (C.C.D. Mass. 1828) (No. 11,134) (Story, J.), although "[i]f congress had prescribed such a rule, the court would certainly be bound to follow it, and proceed upon the law." *Id.* at 615; *see Toland*, 37 U.S. (12 Pet.) at 328 (adopting the reasoning of *Picquet* "as having great force"). The theory Justice Story declined to infer was "repugnant to the general rights and sovereignty of other nations," *Picquet*, 19 F. Cas. at 613, and inconsistent with "principles of public law, public convenience, and immutable justice," *id.* at 614, and he did not suggest that it was in any tension with the Fifth Amendment, "though 'now was the time to say so.'" Brief of Professor Stephen E. Sachs as Amicus Curiae in Support of Petitioners at 12, *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025) (Nos. 24-20, 24-151) (quoting Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1716 (2020)), https://www.supremecourt.gov/DocketPDF/24/24-20/341970/20250204175604486_Nos.%2024-20%2024-151%20Amicus%20Brief.pdf. "Personal jurisdiction at the Founding was a topic not of constitutional law, but of general and international law," whose rules Congress "could also choose to override," *id.* at 8, 11; "[t]he Fifth Amendment simply never came into it," *id.* at 10; and the Fourteenth Amendment, which "merely enforces the limits on the states' sovereign authority, taking those limits as it finds them," *id.* at 17, "did nothing to diminish Congress's power over personal jurisdiction." *Id.* at 14.

"[I]n all cases, where the judicial power of the United States is to be exercised, it is for congress alone to furnish the rules of proceeding, to direct the process, to declare the nature and effect of the process, and the mode, in which the judgments, consequent thereon, shall be executed," and Congress "may authorize national courts to

make general rules and orders, for the purpose of a more convenient exercise of their jurisdiction; but they cannot delegate to any state authority any control over the national courts." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1752, at 625–26 (Boston, Hilliard, Gray & Co. 1833), https://archive.org/details/commentariesonco03stor. The rule Congress has prescribed for this case is a rule of procedure. "The Supreme Court shall have the power to prescribe general rules of practice and procedure and rules of evidence for cases in the United States district courts," 28 U.S.C. § 2072(a), and the rule so prescribed provides that serving a summons "establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A). Its drafters described the paragraph as "explicitly authorizing the exercise of personal jurisdiction over persons who can be reached under state long-arm law," and described the Fourteenth Amendment as a limit on "state-court reach" that "was incorporated into federal practice by the reference to state law." Fed. R. Civ. P. 4 advisory committee's note to 1993 amendment. So "under the Federal Rules of Civil Procedure, '[f]ederal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons,'" and "[a]ny difference between the Fifth and Fourteenth Amendments is therefore implicated in only a subset of federal cases, such as those in which personal jurisdiction is . . . 'authorized by a federal statute.'" *Fuld*, 606 U.S. at 11 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014), and Fed. R. Civ. P. 4(k)(1)(C)). The clause that governs this Court, the Due Process Clause of the Fifth Amendment, "necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority," *id.* at 16; the temptation "to treat the United States as if it were simply one big state" is "to be resisted, for the United States is not simply one big state," Sachs, *supra*, at 3; and what the rule borrows from the Fourteenth is a measure, not a disability. The summons and complaint were served on October 7, 2026, ECF No. 8, at 1, and the Regents has stipulated that "Plaintiff served Defendant with the summons and Complaint on October 7, 2026." ECF No. 10 ¶ 2. What remains under Rule 4(k)(1)

(A) is whether a California court of general jurisdiction could hear this case.

California has answered as far as a State can. Its courts "may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States," Cal. Civ. Proc. Code § 410.10, a section that "manifests an intent to exercise the broadest possible jurisdiction, limited only by constitutional considerations." *Sibley v. Superior Court*, 16 Cal.3d 442, 445 (1976). Among the bases so adopted, the Judicial Council's comment to the section recognizes that "[a] state has power to exercise judicial jurisdiction over an individual who causes effects in the state by an omission or act done elsewhere with respect to causes of action arising from these effects, unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable." *Id.* at 446 (quoting the comment). The constitutional limit the section adopts is the limit *International Shoe* states: a defendant not present within the forum must "have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The Supreme Court of California applies the federal test in three parts, asking whether "the defendant has purposefully availed himself or herself of forum benefits," whether "the 'controversy is related to or "arises out of" [the] defendant's contacts with the forum,'" and whether "'the assertion of personal jurisdiction would comport with "fair play and substantial justice,"'" *Pavlovich v. Superior Court*, 29 Cal.4th 262, 269 (2002) (quoting *Vons Companies, Inc. v. Seabest Foods, Inc.*, 14 Cal.4th 434, 446–47 (1996)); *Snowney v. Harrah's Entertainment, Inc.*, 35 Cal.4th 1054, 1062 (2005); it applies the effects test of *Calder v. Jones*, 465 U.S. 783 (1984), and joins "virtually every jurisdiction" in requiring "intentional conduct expressly aimed at or targeting the forum state in addition to the defendant's knowledge that his intentional conduct would cause harm in the forum," *Pavlovich*, 29 Cal.4th at 271; and it measures relatedness by "a substantial nexus or connection between the defendant's forum activities and the plaintiff's claim," under which "the intensity of

forum contacts and the connection of the claim to those contacts are inversely related," and the "forum contacts need not be directed at the plaintiff." *Snowney*, 35 Cal.4th at 1068 (quoting *Vons*, 14 Cal.4th at 452, 455, 456). The Ninth Circuit's three-part test is the same test, *Briskin v. Shopify, Inc.*, No. 22-15815, slip op. at 19–20 (9th Cir. Apr. 21, 2025) (en banc) (published at 135 F.4th 739) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)), https://cdn.ca9.uscourts.gov/datastore/opinions/2025/04/21/22-15815.pdf, and under either formulation the plaintiff carries the first two parts, after which the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985); *Snowney*, 35 Cal.4th at 1070; *Briskin*, slip op. at 20.

### 1.2 The denial was aimed at this forum

For intentional conduct the first part is the effects test, under which the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803 (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)); *Pavlovich*, 29 Cal.4th at 271–73. A denial is an act, "an external manifestation of the actor's will," *Schwarzenegger*, 374 F.3d at 806 (quoting Restatement (Second) of Torts § 2 (1964)), and Tracey Piercecchi, signing for the Regents of the University of Michigan as "FOIA Coordinator," aimed the determination of August 24, 2026 at the proceedings her letter reproduced. Compl. ¶ 25, at 15.

"The right of access to the courts is indeed but one aspect of the right of petition." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). The Supreme Court's "precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). Section 15.243(1)(v) classifies requesters by the exercise of that right: a "public body" may withhold records from "the requesting party" with whom it is a party to "a civil

action." ECF No. 12, at 7–8, 12. The Regents applied it to the Plaintiff's petitioning activity in this Court and in its bankruptcy unit. "It classified the Plaintiff by her participation in them." Compl. ¶ 14, at 8. In *Calder*, a story written and edited in Florida about a California resident was "expressly aimed at California" because it "concerned the California activities of a California resident," so that "California is the focal point both of the story and of the harm suffered." 465 U.S. at 788–89. The focal point of the denial, and of the harm, is the petitioning in this Court.

*Walden v. Fiore*, 571 U.S. 277 (2014), asks whether "the defendant's suit-related conduct" creates "a substantial connection with the forum State," *id.* at 284, through "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there," so that "the plaintiff cannot be the only link between the defendant and the forum." *Id.* at 285. The connection the Regents formed with this District is the classification itself: the proceedings the denial names are proceedings of this Court and of its bankruptcy unit; the "public body" is, by its own determination, a party to each of them; and the Regents chose those proceedings as the reason it would not produce its outside counsel's bills for them. *Walden* explained *Calder*: "because publication to third persons is a necessary element of libel, . . . the defendants' intentional tort actually occurred in California." *Id.* at 288. What § 15.243(1)(v) requires, "a civil action in which the requesting party and the public body are parties," the Regents found in proceedings of this District. The defendant in *Walden* "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada," *id.* at 289; the Regents' act is defined by proceedings of this District. Compl. ¶¶ 23, 25, at 12–13, 15. The denial "connects [the Regents] to the forum in a meaningful way," *Walden*, 571 U.S. at 290, by a connection that is the Regents' "own choice and not 'random, isolated, or fortuitous.'" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359 (2021) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)); *Briskin*, slip op. at 35 (holding that a defendant "expressly aims" its conduct at a forum when its contacts are of that kind); *id.* at 36–37 (reading *Walden*'s

"forum State itself" to describe a case in which "the plaintiffs were 'the only link' between the defendant and the forum State"). Shopify's answer, that it "operates nationwide and thus is agnostic as to the location" of its conduct, did not succeed: "the Supreme Court has considered and rejected the argument that because a nationwide company is everywhere, it is jurisdictionally nowhere except in its principal place of business and state of incorporation," *id.* at 32 (citing *Ford*, 592 U.S. at 355, 363), and a requirement of differential targeting "would have the perverse effect of allowing a corporation to direct its activities toward all 50 states yet to escape specific personal jurisdiction in each of those states." *Id.* at 35; *see Keeton*, 465 U.S. at 781 ("There is no unfairness in calling it to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed."). Section 15.243(1)(v) reaches "a civil action in which the requesting party and the public body are parties," and the University of Michigan applied it to the Plaintiff's ongoing participation in civil proceedings in the Northern District of California. An act of that kind is among the "single or occasional acts" that, "because of their nature and quality and the circumstances of their commission, may be deemed sufficient to render the corporation liable to suit." *International Shoe*, 326 U.S. at 318.

The harm is the withholding of a public benefit from the Plaintiff on the ground that she has petitioned this Court, and it is suffered where the petitioning is. "An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California." *Calder*, 465 U.S. at 790. *Calder* and *Keeton* were decided the same day, each over an objection drawn from the First Amendment, and the Court "reject[ed] categorically the suggestion that invisible radiations from the First Amendment may defeat jurisdiction otherwise proper under the Due Process Clause." *Keeton*, 465 U.S. at 780 n.12; *see Calder*, 465 U.S. at 790 ("To reintroduce those concerns at the jurisdictional stage would be a form of double counting."). Here the denial is sued upon under Rev. Stat. § 1979, 42 U.S.C. § 1983, as a deprivation, under color of Mich. Comp. Laws § 15.243(1)(v), of a right secured by the

First and Fourteenth Amendments, Compl. ¶¶ 8, 31, 37, at 5, 18, 21, and it was made to turn on the exercise, in this Court, of the right the Petition Clause names. Where the government "brings its sovereign power to bear on citizens at large," *Guarnieri*, 564 U.S. at 392 (quoting *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 599 (2008)), against a petition pending in a court of the United States, the court in which the petition is pending is where the power was brought to bear.

**1.3 The nexus is this District Court**

"The nexus of this case to this District (as opposed to, e.g., the Eastern District of Michigan) is minimal." ECF No. 14, at 2. The civil proceedings by which the Regents classified the Plaintiff are, literally, in this District Court. Fed. R. Civ. P. 79(a)(1); Civil L.R. 1-2(a) (the Civil Local Rules "apply to civil actions filed in this Court"); Civil L.R. 5-1(d)(3) (electronic transmission, "upon receipt by the Clerk," "shall . . . constitute filing of the document for all purposes"); 28 U.S.C. § 158(a) (an appeal "shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving"); *id.* § 157(d) ("The district court may withdraw, in whole or in part, any case or proceeding referred under this section . . . ."); *id.* § 151 (the bankruptcy judges "shall constitute a unit of the district court to be known as the bankruptcy court for that district"); *id.* § 1334(e) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction" of the debtor's property); 11 U.S.C. § 301(a) (a voluntary case "is commenced by the filing with the bankruptcy court of a petition"); 28 U.S.C. § 1409(a) (a proceeding "may be commenced in the district court in which such case is pending"); Fed. R. Bankr. P. 5005(a)(1) (papers "filed with the clerk in the district where the case is pending"); *see* Compl. ¶ 25, at 15 (the file numbers as the denial reproduced them). The records are kept "at one or more of the places where court is held," 28 U.S.C. § 457, which for the Northern District of California are "Eureka, Oakland, San Francisco, and San Jose." *Id.* § 84(a). *See also id.* § 1391(a)(1) ("civil actions brought in district courts of the United States"); *id.* § 1391(b)(2) ("a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred"); Mich. Comp. Laws § 15.243(1)

(v) ("a civil action in which the requesting party and the public body are parties"). The right exercised in those proceedings is the right "to appeal to courts and other forums established by the government for resolution of legal disputes," *Guarnieri*, 564 U.S. at 387, and the forum so established is this Court.

**1.4 The claims arise out of or relate to the forum contact**

The claims arise out of the denial, Compl. ¶¶ 30–43, at 18–23, and relate to the Regents' activity in this forum in the sense the Supreme Court gives the phrase: "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." *Ford*, 592 U.S. at 362. California asks for "a substantial nexus or connection between the defendant's forum activities and the plaintiff's claim," and holds that "'[o]nly when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact].'" *Snowney*, 35 Cal.4th at 1068 (quoting *Vons*, 14 Cal.4th at 455, 456). The operative facts of this controversy are the proceedings in this District and a denial that exists because of them and is defined by them.

**1.5 The suit does not offend fair play and substantial justice**

The burden then shifts to the Regents, which "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *Snowney*, 35 Cal.4th at 1070. The considerations are "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and "the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *Snowney*, 35 Cal.4th at 1070 (quoting *Vons*, 14 Cal.4th at 476). The Judicial Council's comment states the same inquiry for the effects basis: jurisdiction over "an individual who causes effects in the state by an omission

or act done elsewhere" lies "unless the nature of the effects and of the individual's relationship to the state make the exercise of such jurisdiction unreasonable." *Sibley*, 16 Cal.3d at 446.

The effects are those of a denial made to depend on petitions pending in a court that sits, by Act of Congress, at San Francisco, 28 U.S.C. § 84(a), and the dispute is whether a "public body" may so condition a public benefit, which the Supreme Court has not decided. *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32, 40 n.2, 41 (1999) (holding a facial challenge unavailable and leaving the requester's other grounds "open on remand"); *see* ECF No. 12, at 6–9. A State "has a significant interest in redressing injuries that actually occur within the State," and "an especial interest in exercising judicial jurisdiction over those who commit torts within its territory," because "torts involve wrongful conduct which a state seeks to deter, and against which it attempts to afford protection." *Keeton*, 465 U.S. at 776 (quoting *Leeper v. Leeper*, 319 A.2d 626, 629 (N.H. 1974)). The wrong Count I alleges is the penalizing of the right "to appeal to courts and other forums established by the government for resolution of legal disputes," *Guarnieri*, 564 U.S. at 387, exercised in forums established in California, and the forum so established is the forum of this inquiry.

The Regents of the University of Michigan advertises its "relationship to the state." *Sibley*, 16 Cal.3d at 446. The University of Michigan describes itself to applicants as "an institution of more than 50,000 students" with "talented faculty and students from around the world." Office of Undergraduate Admissions, *Life at Michigan*, https://web.archive.org/web/20261015132706/https://admissions.umich.edu/explore-visit/life-michigan. The page is "Produced by Michigan Creative, a unit of the Office of the Vice President for Communications," *id.*, the vice president who "will oversee freedom of information inquiries, executive communications, marketing and design, media relations and public affairs, and the news and broadcasting services." Regents of the University of Michigan, Bylaws § 2.13, https://web.archive.org/web/20261028150631/https://regents.umich.edu/governance/bylaws/bylaws-chapter-02/.

Of the 7,278 first-year students enrolled in Fall 2024, 3,430 were classified as out-of-state for tuition. University of Michigan, *First-Years Class Profile* (Oct. 22, 2024), https://web.archive.org/web/20260619005302/https://obp.umich.edu/wp-content/uploads/pubdata/factsfigures/firstyearsprofile_umaa_2024_10-22-24.pdf. The Office of Undergraduate Admissions publishes, as "Advice from an out-of-state student," a post by Zoe Shafiezadeh, "a marketing and media assistant for the Office of Enrollment Management" who "is originally from Palos Verdes, California, a suburb of Los Angeles," and whose advice to applicants in her position is: "So do it. Move across the country. Don't let fear cloud your judgment." Zoe Shafiezadeh, *Move Across the Country*, Office of Undergraduate Admissions (Jan. 31, 2024), https://web.archive.org/web/20250402153327/https://admissions.umich.edu/explore-visit/blog/move-across-country. The post repeats the advice. *Id.* ("So do it. Move across the country. Put yourself in a possibly uncomfortable situation, and watch yourself thrive in an amazing community dedicated to achieving academic greatness and forming good people."). *See also* Pl.'s Opp'n to Def.'s Mot. to Dismiss First Am. Compl. at 26–27 n.8, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Oct. 21, 2026), ECF No. 25 (collecting these sources). That is "advertising reasonably calculated to reach the State," one of the contacts whose absence was decisive in *World-Wide Volkswagen*, 444 U.S. at 295, and "where individuals 'purposefully derive benefit' from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King*, 471 U.S. at 473–74 (quoting *Kulko v. Superior Court*, 436 U.S. 84, 96 (1978)). Each student so recruited is among the "all persons" to whom Michigan's act extends its benefit, Mich. Comp. Laws § 15.231(2), and a "public body" that withholds the benefit from those who petition courts has "conduct and connection with the forum State" such that it "should reasonably anticipate being haled into court" in the State where those courts sit. *World-Wide Volkswagen*, 444 U.S. at 297.

The Regents of the University of Michigan has also moved across the country. Its Stephen M. Ross School of Business, "Michigan Ross," keeps a campus in Los Angeles: "Michigan Ross Los Angeles sits at the intersection of First and Grand, across from the iconic Walt Disney Concert Hall, in the center of Downtown LA's thriving arts, culture, and entertainment. The state-of-the-art campus offers classrooms and event spaces designed for inspiration and collaboration." Stephen M. Ross School of Business, *Los Angeles*, https://web.archive.org/web/20261028125357/https://michiganross.umich.edu/campus-locations/los-angeles. Michigan Ross counts "54,000+ U-M Alumni Living in California," an "EMBA Established in LA in 2012," and the "# 1 Ranked Business School in Los Angeles"; it describes the undertaking as "Deepening our roots on the West Coast"; and its words for the campus are "Learn in Los Angeles. Lead Anywhere." *Id.* Of its executive MBA, under the heading "Two Locations, Same Unparalleled Experience": "No matter the location, Michigan Ross EMBA students benefit from the same distinguished faculty, challenging curriculum, and executive-level resources." Stephen M. Ross School of Business, *Executive MBA Locations: Los Angeles*, https://web.archive.org/web/20261028125225/https://michiganross.umich.edu/graduate/executive-mba/locations/los-angeles. "Our rigorous curriculum and renowned EMBA faculty mirrors that found in Ann Arbor." *Id.* The campus is "[l]ocated conveniently close to the Los Angeles International Airport." *Id.* Table 1 reproduces Michigan Ross's comparison of its two locations and extends it by one row.

Table 1: **Two locations, same unparalleled experience.** Comparison of the Ann Arbor and Los Angeles locations of the Michigan Ross Executive MBA, after Stephen M. Ross School of Business, *Executive MBA Locations: Los Angeles*, *supra* ("Two Locations, Same Unparalleled Experience"). Rows 1–6 as Michigan Ross publishes them; row 7 extends the comparison to service of process.

| | **Ann Arbor** | **Los Angeles** |
|---|---|---|
| Michigan Ross MBA Degree | ✓ | ✓ |
| Rigorous general management curriculum | ✓ | ✓ |
| World-class faculty | ✓ | ✓ |
| Convenient once-a-month format | ✓ | ✓ |
| Leadership development | ✓ | ✓ |
| Powerful alumni network | ✓ | ✓ |
| Service of process | ✓[‡] | ✓[†] |

‡ Opp'n of Barnes & Thornburg LLP & Amy C. Poyer to Debtor's Mot. for Sanctions at 5, *In re Yang*, No. 3:26-cv-07302-WHO (N.D. Cal. Sept. 15, 2026), ECF No. 16 ("Michigan law designates 'the president, the secretary, or other member of the governing body of a corporate body or an unincorporated board having control of a state institution.' Mich. Ct. R. 2.105(G)(7)."); Bylaws § 2.11, *supra* (the vice president and secretary of the university); Def.'s Mot. to Dismiss First Am. Compl. at 21, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Sept. 28, 2026), ECF No. 18 ("all in Ann Arbor").

† Fed. R. Civ. P. 4(h)(1)(B) ("any other agent authorized by appointment or by law to receive service of process"); Fed. R. Civ. P. 4(h)(1)(A), (e)(1) (the law of the state "where the district court is located or where service is made"); Cal. Civ. Proc. Code § 416.10(b) ("a general manager, or a person authorized by the corporation to receive service of process"); *id.* § 415.20(a) ("with the person who is apparently in charge thereof"); ECF No. 8, at 1; ECF No. 10 ¶ 2.

The summons and complaint in this action were served "in Los Angeles County, CA on October 7, 2026 at 11:56 am at 100 S Grand Ave, Los Angeles, CA 90012 by leaving the following documents with Corey Holt who as Office Manager is authorized by appointment or by law to receive service of process for Regents of the University of Michigan." ECF No. 8, at 1. The Regents of the University of Michigan, through Amy C. Poyer of Barnes & Thornburg LLP, has stipulated to the service. ECF No. 10 ¶ 2. "Michigan Ross Los Angeles | 100 S. Grand Ave., Los Angeles, CA 90012." Stephen M. Ross School of Business, *Ross Los Angeles: The Campus*, https://web.archive.org/web/20261028150627/https://michiganross.umich.edu/campus-locations/los-angeles/visit-LA. "The campus is located within The Grand LA in the Grand Ave Arts Corridor, the city's epicenter of culture," *id.*, "a 30-minute drive from LAX," *id.*, and "[w]e look forward to welcoming you to the new Michigan Ross Los Angeles campus." *Id.*

The burden on the defendant is "always a primary concern." *World-Wide*

*Volkswagen*, 444 U.S. at 292. The Due Process Clause "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit," *id.* at 297, and a "public body" that withholds records on the ground of proceedings pending in a court has structured its conduct by reference to that court. A corporation that "purposefully avails itself of the privilege of conducting activities within the forum State" "has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The Regents of the University of Michigan has instead been "[d]eepening [its] roots on the West Coast." *Los Angeles*, *supra*.

The "shared interest of the several States," *Burger King*, 471 U.S. at 477, is in having a court of the United States decide whether a classification by the exercise of a right secured against the States may stand, and Michigan has disclaimed the interest it might otherwise assert in deciding the question itself: the tribunal the denial named, Compl. ¶ 26, at 15, admits no claimant "who has an adequate remedy upon his claim in the federal courts." Mich. Comp. Laws § 600.6440. Any "clash of the forum's law with the 'fundamental substantive social policies' of another State may be accommodated through application of the forum's choice-of-law rules," *Burger King*, 471 U.S. at 477, and Count II is a claim under Michigan's own act. Compl. ¶¶ 38–43, at 21–23. Among the relief the Plaintiff seeks are an injunction against applying § 15.243(1)(v) to her requests and an order that the Regents cease withholding the engagement and billing records of its counsel in proceedings of this District, Compl. at 24 (Prayer ¶¶ B, D); ECF No. 12, at 2, and the facts on which the denial turned, that those proceedings are pending and who the parties to them are, are entries on this Court's docket. Fed. R. Civ. P. 79(a).

The maintenance of this suit in the District in which the petitions it concerns

are pending does not offend "traditional notions of fair play and substantial justice."[1] *International Shoe*, 326 U.S. at 316 (quoting *Milliken*, 311 U.S. at 463). What makes contacts sufficient, *International Shoe* said, is that they make it "reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there," 326 U.S. at 317, and "what counts as fair play, according to those traditional notions, itself depends on the scope of a state's sovereign authority," so that "[w]hat is reasonable, in the context of our federal system of government, may be very different for an individual state of that system than for the federal government itself." Sachs, *supra*, at 18–19. The particular suit brought in this District concerns proceedings of this Court to which the "public body" is, by its own determination, a party, and an act of the "public body" that depends on them. The Fifth Amendment, which governs this Court, permits more than the measure Rule 4(k)(1)(A) borrows, *Fuld*, 606 U.S. at 16–18, and this suit lies within the measure.

## 2 Venue

The order reads the complaint as "asserting that there is venue based on 28 U.S.C. § 1391(b)(3)," quotes that paragraph as providing for venue "if there is no district in which any [sic] action may otherwise be brought as provided in this section," finds that "[t]hat is not the case here," and concludes that "[v]enue would appear to apply to the district in which the University of Michigan is located, not the Northern District of California." ECF No. 14, at 2 (citing Compl. ¶ 15). The paragraph cited pleads venue under § 1391(b)(1), through § 1391(c)(2) and (d), and does not mention § 1391(b)(3).[2] Compl. ¶ 15, at

[1]The phrase is *Milliken*'s, where it appears without quotation marks and with a citation to *McDonald v. Mabee*, 243 U.S. 90 (1917). 311 U.S. at 463. "There is a strong emotional appeal in the words 'fair play,' 'justice,' and 'reasonableness.' But they were not chosen by those who wrote the original Constitution or the Fourteenth Amendment as a measuring rod." 326 U.S. at 325 (opinion of Black, J.).

[2]*But see* Pl.'s Opp'n, *supra*, at 4–12 (§ 1409(a) "does not address a proceeding arising under title 11 whose case has been dismissed"; § 1391(b)(1) through § 1391(c)(2) and Fed. R. Bankr. P. 7004(d), (f); § 1391(b)(2); and, in the alternative, § 1391(b)(3), as "a provision for the case the Motion describes," so that "[t]o avoid the third ground the University of Michigan would have to name a district proper under the first or the second, and the Motion names no district"); Def.'s Mot. to Dismiss First Am. Compl., *supra*, at 9–12 (§ 1409(a) as venue "otherwise provided by law"; § 1391 "is not an independent basis for venue of 'proceedings' in bankruptcy"; the pleading "would fail under § 1391(b)(2) in any event"; no mention of § 1391(b)(3)); Def.'s Reply in Supp. of Mot. to Dismiss First Am. Compl. at 1–3, *Yang v. Lynch (In re Yang)*,

8–9.

## 2.1 Venue is proper in the Northern District of California

"Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." *Atlantic Marine Construction Co. v. United States District Court*, 571 U.S. 49, 55 (2013). "Except as otherwise provided by law," "this section shall govern the venue of all civil actions brought in district courts of the United States," 28 U.S.C. § 1391(a)(1), and "[w]hen venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b). If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)." *Atlantic Marine*, 571 U.S. at 56. The first category is "a judicial district in which any defendant

Adv. No. 26-03032 (Bankr. N.D. Cal. Oct. 28, 2026), ECF No. 26 (captioned "OAKLAND DIVISION") ("If § 1391 governed, venue would lie in Michigan," because "Ann Arbor is in the Eastern District of Michigan, 28 U.S.C. § 102(a)(1), and in her action there the Plaintiff has pleaded that venue is proper under § 1391(b)(1) because 'all Defendants reside in the State of Michigan,'" so that "§ 1391(b)(3) . . . has no work to do"; and, of § 1391(c)(2), that "courts addressing official-capacity defendants locate their residence at the agency's offices," a residence "fixed by the location of its headquarters and offices" (quoting *Trout v. County of Madera*, No. 21-cv-06061-PJH, 2022 WL 2479156, at *7 (N.D. Cal. July 6, 2022))) (quoting Compl. ¶ 7, *Yang v. Educational Computer Systems, Inc.*, No. 2:26-cv-12839 (E.D. Mich. Aug. 13, 2026), ECF No. 1 ("Venue is proper under 28 U.S.C. § 1391(b)(1): all Defendants reside in the State of Michigan (Educational Computer Systems, Inc. being subject to this Court's personal jurisdiction with respect to this action, and so deemed to reside here, *id.* § 1391(c)(2), (d)), and at least one Defendant resides in this District."), *reproduced as* Ex. A to Def.'s Req. for Judicial Notice, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Sept. 28, 2026), ECF No. 19-1, at 4). The motion to dismiss there reads § 1409(a) as the only venue provision for a proceeding arising under title 11, finds no case under title 11 pending in any district, and asks for dismissal rather than transfer; on that reading the proceeding has venue in no district. The opposition argues venue under § 1391(b)(1), through § 1391(c)(2) and Fed. R. Bankr. P. 7004(d), (f), and under § 1391(b)(2), and, assuming without deciding that neither is met, that § 1391(b)(3) is the provision Congress wrote for that case, its measure, the court's personal jurisdiction, being met under Rule 7004 and the Fifth Amendment. The reply maintains that § 1409(a) governs and adds that, if § 1391 governed, venue would lie in the Eastern District of Michigan, on the authority of the Plaintiff's complaint in that District, whose venue paragraph deems a Pennsylvania corporation to reside there under § 1391(c)(2), and of a decision locating an official-capacity defendant's residence at its offices. To the opposition's point on the reply's own reading, that a proceeding within the jurisdiction of every district court and the venue of none is the case § 1391(b)(3) answers, the reply does not respond. The motion is set for hearing on November 4, 2026. Section 2.3. *See also* Stephen E. Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1745 (2020), https://virginialawreview.org/wp-content/uploads/2021/01/Sachs_Book.pdf (Rule 4(k)(2) "mak[es] service effective for jurisdiction over any defendant on a federal claim if no state court would have jurisdiction," so that "in any case with an otherwise forum-less federal claim . . . Rule 4(k)(2) straightforwardly authorizes the assertion of federal jurisdiction"); *id.* at 1761 (of a reading under which Congress would "deny personal jurisdiction while expanding venue," that it would be "irrationally taking with one hand what it gave with the other"); *id.* at 1768 (the confusion "ought to be corrected—and soon, before it deprives deserving plaintiffs of a forum").

resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). The Regents of the University of Michigan is the sole defendant, and the question is where it resides.

The section answers that question in the subsection captioned "Residency": "For *all* venue purposes . . . an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, *shall* be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* § 1391(c), (c)(2) (emphasis added). For a State "which has more than one judicial district," the next subsection adds that "such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State." *Id.* § 1391(d). The present text dates from the Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, § 202, 125 Stat. 758, 763–64, https://www.govinfo.gov/content/pkg/STATUTE-125/pdf/STATUTE-125-Pg758.pdf. The Judicial Code of 1948 had provided that a corporation "may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes." Act of June 25, 1948, ch. 646, § 1391(c), 62 Stat. 869, 935, https://www.govinfo.gov/content/pkg/STATUTE-62/pdf/STATUTE-62-Pg869.pdf. The Judicial Improvements and Access to Justice Act of 1988 put in its place: "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced," followed by the sentence on States with more than one district that is now subsection (d). Pub. L. No. 100-702, § 1013(a), 102 Stat. 4642, 4669, https://www.govinfo.gov/content/pkg/STATUTE-102/pdf/STATUTE-102-Pg4642.pdf. The 2011 text is "worded . . . almost identically to the original version of the statute," *TC Heartland LLC v. Kraft Foods Group Brands LLC*, No. 16-341, slip op. at 10 (U.S. May 22, 2017) (published at 581 U.S. 258), https://www.supremecourt.gov/opinions/16pdf/16-341_8n

59.pdf, extended from corporations to every "entity with the capacity to sue and be sued in its common name," and it yields only where the law "otherwise provide[s]," as the patent venue statute does. *Id.* at 9.

"A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819). It is "the metaphysical person liable to suit." *Bank of Kentucky v. Wister*, 27 U.S. (2 Pet.) 318, 323 (1829). Where a "metaphysical" person "resides," for the purposes of 28 U.S.C. § 1391, is a question of federal statutory law. Venue is "the special statutory term," and § 1391 "cannot reasonably be read to allow judicial consideration of other, extrastatutory limitations on the forum in which a case may be brought." *Atlantic Marine*, 571 U.S. at 56.

The Regents of the University of Michigan is "a body corporate known as the Regents of the University of Michigan," Mich. Const. art. VIII, § 5, "with the right, as such, of suing and being sued," Mich. Comp. Laws § 390.4; Fed. R. Civ. P. 17(b)(2) (capacity to be sued determined, for a corporation, "by the law under which it was organized"), and it is sued in that common name in this action. ECF No. 1; ECF No. 10, at 1. It is "an entity with the capacity to sue and be sued in its common name under applicable law," 28 U.S.C. § 1391(c)(2), "whether or not incorporated." *Id.*; *cf. Galette v. New Jersey Transit Corp.*, 607 U.S. 509, 524 (2026) ("The clearest evidence that a State has created a legally separate entity is that it created a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt."). It is subject to this Court's personal jurisdiction "with respect to the civil action in question," Part 1, and so, "[f]or all venue purposes," it "*shall* be deemed to reside" in this District. 28 U.S.C. § 1391(c)(2) (emphasis added). California has four judicial districts, *id.* § 84, and the contacts that subject the body corporate to jurisdiction with respect to this action, a denial aimed at petitions pending in this Court and in its

bankruptcy unit, are contacts with this District, which "would be sufficient to subject it to personal jurisdiction if that district were a separate State." *Id.* § 1391(d). This action was therefore brought in "a judicial district in which any defendant resides," 28 U.S.C. § 1391(b)(1); venue is proper, *Atlantic Marine*, 571 U.S. at 56; and the third category, available only "if there is no district in which an action may otherwise be brought as provided in this section," 28 U.S.C. § 1391(b)(3), is not reached. Section 1391(c) deems "a natural person" to reside in "the judicial district in which that person is domiciled," 28 U.S.C. § 1391(c)(1), and an entity in "any judicial district" in which it is subject to the court's jurisdiction with respect to the action, *id.* § 1391(c)(2); the first article is definite and the second is not. An entity resides, "[f]or all venue purposes," in every judicial district that answers to the description; § 1391(b)(1) asks for "a judicial district in which any defendant resides"; and whether venue is proper in the district chosen "depends exclusively" on that district. *Atlantic Marine*, 571 U.S. at 55. The district "in which the University of Michigan is located," ECF No. 14, at 2, may be another district "where it might have been brought," 28 U.S.C. § 1404(a), and a second such district does not make this District "the wrong division or district." *Id.* § 1406(a); *see also* Pl.'s Opp'n, *supra*, at 10 ("residence for venue purposes is a question Congress has answered by reference to jurisdiction rather than to location").

### 2.2 The action should not be transferred

Section 1404(a) "operates on the premise that the plaintiff has properly exercised his venue privilege." *Van Dusen v. Barrack*, 376 U.S. 612, 634 (1964). The premise holds, *see* Section 2.1, and so does the residence on which it rests: "[f]or *all* venue purposes," the Regents of the University of Michigan "*shall* be deemed to reside" in this District, 28 U.S.C. § 1391(c), (c)(2) (emphasis added), including for the purposes of the section that the Judicial Code of 1948 captioned "Change of venue" and placed in chapter 87, "District Courts; Venue," Act of June 25, 1948, ch. 646, 62 Stat. 869, 935, 937, a chapter that defines "venue" as "the geographic specification of the proper court or courts for the litigation of a civil action," 28 U.S.C. § 1390(a), and whose transfers run only to a

district "where it might have been brought," which is to say a district fixed by "the federal laws delimiting the districts in which such an action 'may be brought.'" *Van Dusen*, 376 U.S. at 624; *Atlantic Marine*, 571 U.S. at 57–58. The 1948 phrase, "for venue purposes," already covered "all venue statutes," *TC Heartland*, slip op. at 8 (quoting *Pure Oil Co. v. Suarez*, 384 U.S. 202, 204–05 (1966)), before "the addition of the word 'all' to the already comprehensive provision." *Id.* at 9; *see also* Pl.'s Opp'n, *supra*, at 7 ("'All' admits no exception for the venue purposes of the bankruptcy provisions of chapter 87 . . . ."); *id.* at 26 ("Where the University of Michigan resides is, '[f]or all venue purposes,' a matter of statute . . . ."). If "all" means anything, then "at the very least," ECF No. 14, at 2, the naked theory that the University of Michigan "is located" in another district, *id.*, would not justify a change of venue. An entity "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, *if a plaintiff*, only in the judicial district in which it maintains its principal place of business." 28 U.S.C. § 1391(c)(2) (emphasis added).

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The revisers who wrote the subsection explained that it "requires the court to determine that the transfer is necessary for convenience of the parties and witnesses, and further, that it is in the interest of justice to do so," 28 U.S.C. § 1404 (Historical and Revision Notes); *Van Dusen*, 376 U.S. at 634–35 n.30 (quoting the note), by "an individualized, case-by-case consideration of convenience and fairness," *id.* at 622, among the private and public interests the Supreme Court named in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508–09 (1947), and this Circuit has restated. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000). "Because plaintiffs are ordinarily allowed to select whatever forum they consider most advantageous (consistent with jurisdictional and venue limitations), [the Supreme Court has] termed their selection the 'plaintiff's venue privilege,'" *Atlantic Marine*, 571 U.S. at 63 (quoting *Van Dusen*,

376 U.S. at 635), which § 1404(a) "was not designed to narrow." *Van Dusen*, 376 U.S. at 635. The section "provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient," *id.* at 645–46, and in this Circuit "[t]he defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum." *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

Venue "is not a qualification upon the power of the court to adjudicate, but a limitation designed for the convenience of litigants, and, as such, may be waived by them," *Olberding v. Illinois Central Railroad Co.*, 346 U.S. 338, 340 (1953); the statute "merely accords to the defendant a personal privilege respecting the venue, or place of suit, which he may assert, or may waive, at his election," *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 168 (1939) (quoting *Commercial Casualty Insurance Co. v. Consolidated Stone Co.*, 278 U.S. 177, 179 (1929)), because "the locality of a law suit—the place where judicial authority may be exercised—though defined by legislation relates to the convenience of litigants and as such is subject to their disposition." *Id.* The Regents of the University of Michigan has filed one paper in this action, a stipulation signed by Amy C. Poyer of Barnes & Thornburg LLP, "2029 Century Park East, Suite 300, Los Angeles, CA 90067-3012," that "Defendant requires more time to evaluate its response to Plaintiff's Complaint." ECF No. 10, at 1, ¶ 4; *see also* Pl.'s Opp'n, *supra*, at 26 ("On convenience otherwise, the University of Michigan appears here through counsel in Los Angeles . . . ."). A court may take venue up on its own motion before the defendant has waived it, "so long as the parties are first given the opportunity to present their views on the issue," *Costlow v. Weeks*, 790 F.2d 1486, 1488 (9th Cir. 1986), and the order to show cause is that opportunity.

Section 1404(a) speaks of "the convenience of parties and witnesses," and the venue statutes are themselves "generalized attempts to promote the same goals of convenience and fairness," *Van Dusen*, 376 U.S. at 623, of which § 1391(c)(2) is the attempt Congress made for an entity sued as a defendant. What remains for a body corporate, "invisible,

intangible, and existing only in contemplation of law," *Dartmouth College*, 17 U.S. (4 Wheat.) at 636, is the showing "by particular circumstances," *Commodity Futures Trading Commission v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979), of witnesses and of proof. *See Pacific Car & Foundry Co. v. Pence*, 403 F.2d 949, 953 (9th Cir. 1968) ("Many witnesses, including several members of petitioner's corporate staff, would have to travel from the mainland to Hawaii," and "up to one thousand file drawers of records"); *McGee v. International Life Insurance Co.*, 355 U.S. 220, 223 (1957) ("modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity").

Among the matters "in the interest of justice," 28 U.S.C. § 1404(a), is the Plaintiff's motion for a preliminary injunction, ECF No. 12, noticed for hearing "on Thursday, December 3, 2026, at 1:30 p.m., or as soon thereafter as the matter may be heard, by Zoom videoconference or as the Court may otherwise direct," ECF No. 12, at 2, with "Responses due by 11/9/2026. Replies due by 11/16/2026," ECF No. 12 (docket text), the hearing since "reset from 12/3/2026, at 1:30 PM to 12/3/2026, at 10:30 AM in San Francisco, - Videoconference Only before Judge Edward M Chen," a proceeding that "will be held via a Zoom webinar," Clerk's Notice Rescheduling Time of Motion Hearing, ECF No. 13 (Oct. 27, 2026) (docket text), on the rule that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." ECF No. 12, at 13 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). *Cf. Carson v. American Brands, Inc.*, 450 U.S. 79, 83–84 (1981) (an interlocutory order that "had the practical effect" of refusing an injunction is appealable under 28 U.S.C. § 1292(a)(1) where it "might have a 'serious, perhaps irreparable, consequence,'" and "can be 'effectually challenged' only by immediate appeal"); *Trump v. Cook*, 609 U.S. 528, 550 n.3 (2026) ("When a party comes to us for interim relief, however, we 'cannot hide in the tall grass.' . . . Ultimately, 'we must grant or deny.'" (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 874 (2025) (Kavanaugh, J., concurring))); ECF No. 12, at 18. An order of transfer under § 1404(a) is interlocutory and is not appealable before

final judgment; in this Circuit it is reviewed, when it is reviewed, on a petition for a writ of mandamus, *Pacific Car*, 403 F.2d at 951–52; 28 U.S.C. § 1651(a), or on a certification under 28 U.S.C. § 1292(b), *see Jones*, 211 F.3d at 497, and the transfer takes effect, ending the jurisdiction of this Circuit over the case, when the papers are docketed in the transferee court. *Lou v. Belzberg*, 834 F.2d 730, 733 (9th Cir. 1987). A dismissal is one of the "final decisions of the district courts," 28 U.S.C. § 1291, appealable as of right, and the transfer that § 1406(a) permits in place of dismissal, "if it be in the interest of justice," exists for the plaintiff's protection against the hazard that a plaintiff dismissed from the wrong court "lose out completely, through the running of the statute of limitations in the forum finally deemed appropriate." *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955) (quoting *All States Freight, Inc. v. Modarelli*, 196 F.2d 1010, 1011 (3d Cir. 1952)); *see Costlow*, 790 F.2d at 1488 ("The statute requires a transfer, however, only in cases where it is in 'the interest of justice.'"). The Plaintiff does not ask for that "protection."

### 2.3 This Court sits at San Francisco

This Court sits at San Francisco by Act of Congress, 28 U.S.C. § 84(a), and has since the Forty-ninth Congress made the district of California two and provided that "the circuit and district courts shall be held therein at San Francisco."[3] *See, e.g.*, Phoebe Bridgers, Setlist at Chase Center, San Francisco, CA, USA (Oct. 27, 2026) (The Lost Tour 2026; "Doors: 6:00 PM"; "Start time: 9:00 PM"; "End: 10:50 PM"; "Motion Sickness"; "Kill Me"; "The Governor's Waltz"; "Garden Song"; "Moon Song"; "Liberty Tree"; "Lost Weekend"; "Funeral"; "Still Standing"; "Kyoto"; "I Know the End"; "Encore:"; "Scott Street"; "Never Going Back!" (sung by band)), setlist.fm, https://web.archive.org/web/20261103002402/https://www.setlist.fm/setlist/phoebe-bridgers/2026/chase-center-san-francisco-ca-b751946.html. The Eastern District of Michigan holds court for its Southern Division "at Ann Arbor, Detroit, Flint, and Port Huron," 28 U.S.C. § 102(a)(1),

[3]Act of Aug. 5, 1886, ch. 928, § 3, 24 Stat. 308, 309, https://www.govinfo.gov/content/pkg/STATUTE-24/pdf/STATUTE-24-Pg308.pdf. The complaint pleads that "[t]his action arises in the County of San Francisco" and "is assignable to the San Francisco Division or the Oakland Division." Compl. ¶ 16, at 9 (citing Civil L.R. 3-2(c), (d)).

the second of which the Thirty-seventh Congress made the district's "judicial centre," and the first of which the Eighty-eighth added in 1964.[4]

The National Centers for Environmental Information publish the climate normals of the United States for the thirty years 1991 through 2020, and Table 2 sets the station at San Francisco Downtown beside the station at the University of Michigan in Ann Arbor. The National Weather Service defines the wind chill temperature "only for temperatures at or below 50°F" (10 °C),[5] and the normal winter minimum at San Francisco Downtown is 8.4 °C, Table 2, so that the index is available there on a normal winter night. The Service explains the index by example: "If the temperature is 0°F and the wind is blowing at 15 mph, the wind chill is −19°F. At this wind chill temperature, exposed skin can freeze in 30 minutes." *Understanding Wind Chill*, *supra* (0 °F is −17.8 °C, 15 mph is 6.7 m $s^{-1}$, and −19 °F is −28.3 °C). At Ann Arbor the temperature falls to −17.8 °C or below on 4.4 days of a normal year and does not rise above 0 °C on 44.7. Table 2.

[4] Act of Feb. 24, 1863, ch. 54, § 1, 12 Stat. 660, 661, https://www.govinfo.gov/content/pkg/STATUTE-12/pdf/STATUTE-12-Pg660.pdf; 28 U.S.C. § 102 (Editorial Notes, Amendments, 1964).

[5] National Weather Service, *Understanding Wind Chill*, https://web.archive.org/web/20261020123655/https://www.weather.gov/safety/cold-wind-chill-chart.

Table 2: **Climate normals, 1991–2020.** National Centers for Environmental Information, *U.S. Climate Normals 1991–2020*, annual and seasonal normals for station USW00023272, "SAN FRANCISCO DWTN, CA US," and station USC00200230, "ANN ARBOR U OF MICH, MI US," https://www.ncei.noaa.gov/data/normals-annualseasonal/1991-2020/access/ (visited Nov. 1, 2026). The dataset reports temperatures in degrees Fahrenheit and depths in inches, with thresholds of 90 °F, 32 °F, 0 °F and 1 inch; the values are converted here. A dash marks a quantity the dataset does not report for the station.

| | **San Francisco** | **Ann Arbor** |
|---|---|---|
| Annual mean temperature (°C) | 14.3 | 9.3 |
| Winter (Dec.–Feb.) mean maximum temperature (°C) | 14.8 | 1.4 |
| Winter (Dec.–Feb.) mean minimum temperature (°C) | 8.4 | −7.4 |
| Summer (Jun.–Aug.) mean maximum temperature (°C) | 19.4 | 27.7 |
| Summer (Jun.–Aug.) mean minimum temperature (°C) | 12.4 | 14.6 |
| Days a year with maximum temperature ≥ 32.2 °C | 3.3 | 12.3 |
| Days a year with minimum temperature ≤ 0 °C | 0.0 | 130.1 |
| Days a year with maximum temperature ≤ 0 °C | 0.0 | 44.7 |
| Days a year with minimum temperature ≤ −17.8 °C | 0.0 | 4.4 |
| Annual snowfall (cm) | — | 156.0 |
| Days a year with snow depth ≥ 2.5 cm | — | 59.0 |
| Annual precipitation (mm) | 581.4 | 971.8 |

The National Weather Service's memorandum on the climate of San Francisco places California "in the relatively rare Mediterranean (Etesian) type climate (Köppen type Cs)," a type "generally characterized by moist mild winters and dry summers."[6] "Summertime in San Francisco is characterized by cool marine air and persistent coastal stratus and fog, with average maximum temperatures between 60°F and 70°F, and minima between 50°F and 55°F," *id.* (15.6 to 21.1 °C and 10.0 to 12.8 °C); "[w]inter temperatures in San Francisco are quite temperate, with highs between 55°F and 60°F and lows ranging from 45°F to 50°F," *id.* at 3 (12.8 to 15.6 °C and 7.2 to 10.0 °C); and "[s]now is extremely rare in San Francisco." *Id.*

The Weather Bureau's bulletin of 1903, which the memorandum cites, opens its account of the city: "On the coast of California there is a city justly famed for the

[6] Jan Null, *Climate of San Francisco* 2 (NOAA Technical Memorandum NWS WR-126, 3d rev. 1995), https://www.weather.gov/media/wrh/online_publications/TMs/TM-126.pdf; also in the NOAA Institutional Repository, https://repository.library.noaa.gov/view/noaa/7276.

abnormalities of its climate. Overcoats and heavy wraps are worn in midsummer, while the lilies bloom in December."[7] *But see* Mark Twain, *Roughing It* 410 (Hartford, American Publishing Co. 1872) (1879 printing), https://archive.org/details/roughingit00twai ("Even the kindly climate is sometimes pleasanter when read about than personally experienced, for a lovely, cloudless sky wears out its welcome by and by, and then when the longed for rain does come it stays. Even the playful earthquake is better contemplated at a dis— However there are varying opinions about that. The climate of San Francisco is mild and singularly equable. The thermometer stands at about seventy degrees the year round. It hardly changes at all. You sleep under one or two light blankets Summer and Winter, and never use a mosquito bar. Nobody ever wears Summer clothing. You wear black broadcloth—if you have it—in August and January, just the same. It is no colder, and no warmer, in the one month than the other. You do not use overcoats and you do not use fans. It is as pleasant a climate as could well be contrived, take it all around, and is doubtless the most unvarying in the whole world.") (seventy degrees being 21.1 °C); *id.* at 410–11 ("The wind blows there a good deal in the Summer months, but then you can go over to Oakland, if you choose—three or four miles away—it does not blow there. It has only snowed twice in San Francisco in nineteen years, and then it only remained on the ground long enough to astonish the children, and set them to wondering what the feathery stuff was."); *id.* at 412 ("I have elsewhere spoken of the endless Winter of Mono, California, and but this moment of the eternal Spring of San Francisco. Now if we travel a hundred miles in a straight line, we come to the eternal Summer of Sacramento. One never sees Summer-clothing or mosquitoes in San Francisco—but they can be found in Sacramento."); *cf.* Letter from Samuel L. Clemens to Lucius Fairchild (Apr. 28, 1880) ("Paris the cold, Paris the drizzly, Paris the rainy, Paris the Damnable. More than a hundred years ago, somebody asked Quin, 'Did

[7] Alexander G. McAdie, *Climatology of California* 33 (U.S. Dep't of Agric., Weather Bureau Bull. L, 1903), https://archive.org/details/climatologyofcal00mcadrich. The memorandum cites the bulletin for the city's "exceedingly diversified topography." Null, *supra*, at 1.

you ever see such a winter in all your life before?' 'Yes,' said he, 'last summer.' I judge he spent his summer in Paris."), *in* Mark Twain Project Online (UCCL 01794), https://web.archive.org/web/20261103065940/https://www.marktwainproject.org/letters/uccl01794/. "When a native of San Francisco is asked which is the coldest month of the year, he is generally at a loss for an answer; and if asked which is the warmest he may say November." McAdie, *supra*, at 34. "Visitors to the city should by all means wear heavy wraps or overcoats during the summer afternoon." *Id.* The Weather Bureau's experiments "with kites" had made it "evident that in summer as we ascend from the ground the temperature rises," so that "the citizen of the San Francisco Bay section can regulate the temperature to suit himself, having a choice between these limits: 55° at sea level and 85° at 2,000 feet above." *Id.* (55° being 12.8 °C, 85° being 29.4 °C, and 2,000 feet being 610 m). The normal summer maximum at San Francisco Downtown is 19.4 °C, and the temperature reaches 32.2 °C on 3.3 days of a normal year; at Ann Arbor, 27.7 °C and 12.3 days. Table 2.

Sunshine reaches the surface at San Francisco for 55 percent of the time possible between sunrise and sunset in December and for 67 percent over the year, and at Detroit for 31 percent in December and for 52 percent over the year; a San Francisco year has 105 cloudy days and a Detroit year 185, of which 22 fall in December, with 3 clear.[8]

Table 3 sets the climatology of the National Aeronautics and Space Administration for the coordinates of the courthouse, ECF No. 12, at 2, and of the Plaintiff's address of record, ECF No. 1, at 1, beside the Naval Observatory's times of sunrise and sunset at each for the shortest day of this year: at 450 Golden Gate Avenue the sun rises on December 21, 2026 at 7:21 a.m. and sets at 4:54 p.m.; at 200 East Liberty Street, Ann

[8]National Centers for Environmental Information, *Comparative Climatic Data*, Sunshine—Average Percent of Possible (data through 2023; station 23272, San Francisco, 1965–1974, and station 94847, Detroit, 1966–1983), https://www.ncei.noaa.gov/sites/default/files/2024-11/pctpos23.txt; *id.*, Cloudiness—Mean Number of Days (Clear, Partly Cloudy, Cloudy) (station 23234, San Francisco Airport, and station 94847, Detroit), https://www.ncei.noaa.gov/sites/default/files/2024-11/clpcdy23.txt (both visited Nov. 1, 2026). "Cloudy denotes 8/10 to 10/10 average sky cover." National Centers for Environmental Information, *Comparative Climatic Data (CCD)*, https://web.archive.org/web/20261102004255/https://www.ncei.noaa.gov/products/land-based-station/comparative-climatic-data.

Arbor, it rises at 8:01 a.m. and sets at 5:06 p.m.

Table 3: **Sky and sun at the addresses of record.** Rows 1–5: National Aeronautics and Space Administration, Langley Research Center, *POWER Project*, Climatology API v2.10.1, monthly and annual climatologies for January 2001 through December 2025, parameters CLOUD_AMT (cloud amount), CLRSKY_SFC_SW_DWN (clear-sky surface shortwave downward irradiance), and ALLSKY_SFC_SW_DWN (all-sky surface shortwave downward irradiance), https://power.larc.nasa.gov/ (queried Nov. 1, 2026); irradiance is the daily mean, converted from the kWh $m^{-2}$ $d^{-1}$ of the dataset (1 kWh $m^{-2}$ $d^{-1}$ = 41.67 W $m^{-2}$). Rows 6–7: United States Naval Observatory, Astronomical Applications Department, *Rise / Set / Transit Times API* v4.0.1, https://aa.usno.navy.mil/ (queried Nov. 1, 2026). The coordinates are those the Census Bureau's geocoder returns for 450 Golden Gate Avenue, San Francisco, 37.7814° N, 122.4177° W, and for 200 East Liberty Street, Ann Arbor, 42.2795° N, 83.7473° W. United States Census Bureau, *Geocoder* (benchmark Public_AR_Current), https://geocoding.geo.census.gov/ (queried Nov. 1, 2026).

| | **San Francisco** | **Ann Arbor** |
|---|---|---|
| Cloud amount, December (%) | 59.1 | 78.9 |
| Cloud amount, annual (%) | 52.8 | 63.3 |
| Clear-sky irradiance, December (W $m^{-2}$) | 120.1 | 95.5 |
| All-sky irradiance, December (W $m^{-2}$) | 88.9 | 51.7 |
| All-sky irradiance, annual (W $m^{-2}$) | 197.3 | 157.9 |
| Sunrise, December 21, 2026 (local standard time) | 7:21 a.m. | 8:01 a.m. |
| Sunset, December 21, 2026 (local standard time) | 4:54 p.m. | 5:06 p.m. |

The National Weather Service describes the lake effect: "Lake effect snow is common across the Great Lakes region during the late fall and winter. Lake Effect snow occurs when cold air, often originating from Canada, moves across the open waters of the Great Lakes. As the cold air passes over the unfrozen and relatively warm waters of the Great Lakes, warmth and moisture are transferred into the lowest portion of the atmosphere. The air rises, clouds form and grow into narrow band[s] that produce[] 2 to 3 inches of snow per hour or more" (5 to 8 cm per hour).[9] A transfer under § 1404(a) would condition the hearing of the Plaintiff's petition on "cold air, often originating from Canada." *Cf.* ECF No. 12, at 8 (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)); Compl. ¶ 33, at 19. *But cf.* Olivia Rodrigo, Setlist at Scotiabank

[9]National Weather Service, *What is a Lake Effect Snow?*, https://web.archive.org/web/20261102002233/https://www.weather.gov/safety/winter-lake-effect-snow. "Heavy snow may be falling in one location, while the sun may be shining just a mile or two away in either direction." *Id.* (1.6 to 3.2 km).

Arena, Toronto, ON, Canada (Oct. 27, 2026) (The Unraveled Tour; "Act I: Spring"; "so american"; "good 4 u"; "Act II: Summer"; "bad idea right?"; "ballad of a homeschooled girl"; "Act III: Summer Twilight"; "vampire"; "Act IV: Autumn"; "stupid song"; "traitor"; "Act V: Winter"; "drivers license"; "the cure"; "Act VI: Spring II"; "all-american bitch"; "deja vu"), setlist.fm, https://web.archive.org/web/20261103002419/https://www.setlist.fm/setlist/olivia-rodrigo/2026/scotiabank-arena-toronto-on-canada-5b770bc8.html.

The survey of the country that Congress directed in 1812 was suspended for the winter of 1815 and abandoned by Act of Congress in 1816. The Act of May 6, 1812 had authorized the President "to cause to be surveyed two millions of acres of the lands of the United States, in the territory of Michigan, for the purpose of satisfying the bounties of land promised to the non-commissioned officers and soldiers of the United States." Act of Apr. 29, 1816, ch. 164, § 1, 3 Stat. 332, 332 (reciting Act of May 6, 1812, ch. 77, 2 Stat. 728) (two million acres being 8,094 km$^2$), https://www.govinfo.gov/content/pkg/STATUTE-3/pdf/STATUTE-3-Pg332.pdf. The Surveyor General reported to the Commissioner of the General Land Office from Chillicothe on November 30, 1815 that the surveyors "have been obliged to suspend their operations until the country shall be sufficiently frozen so as to bear man and beast," that "[t]he frost set in early, and the ice covered nearly the whole country, but broke through at every step," that they "were, therefore, obliged to submit to the climate and its attendant rigors," and that "when the ice is sufficiently strong to bear man and beast, a deep snow would still embarrass the surveyors."[10]

The description annexed, in which "all the surveyors concur," found that "there would not be more than one acre out of a hundred, if there would be one out of a thousand, that would, in any case, admit of cultivation," 3 American State Papers: Public Lands,

[10] Letter from Edward Tiffin, Surveyor General, to Josiah Meigs, Commissioner of the General Land Office (Nov. 30, 1815), *in* 3 American State Papers: Public Lands 164, 164 (Walter Lowrie ed., Washington, Gales & Seaton 1834), https://archive.org/details/americanstatepap_a03unit. The Surveyor General wrote again on December 11 that "[s]ubsequent accounts confirm the statements, and make the country out worse (if possible) than I had represented it to be." *Id.* at 165. President Madison laid the representation before Congress, that the lands "are so covered with swamps and lakes, or otherwise unfit for cultivation, that a very inconsiderable proportion can be applied to the intended grants." Message from the President of the United States (Feb. 6, 1816), *in* 3 American State Papers: Public Lands, *supra*, at 162.

*supra*, at 164–65, and the Fourteenth Congress repealed so much of the Act of 1812 "as authorizes the President of the United States to cause to be surveyed two millions of acres of the lands of the United States, in the territory of Michigan," and provided "in lieu of the said two millions of acres of land" for the survey of lands "fit for cultivation" in the Illinois and Missouri territories. Act of Apr. 29, 1816, § 1, 3 Stat. at 332.

Of the Bay of San Francisco, the Senate was told in 1848 that it "has been celebrated, from the time of its first discovery, as one of the finest in the world," with "mildness and salubrity of climate," and that "[i]ts latitudinal position is that of Lisbon, its climate is that of southern Italy; settlements upon it for more than half a century attest its healthiness"; and, of "maritime California," whose middle division includes "the bay and basin of San Francisco," that "[s]ummer and winter, in our sense of the terms, are not applicable to this part of the country," where "[i]t is not heat and cold, but wet and dry which mark the seasons; and the winter months, instead of killing vegetation, revive it"; and that "[s]alubrity and a regulated mildness characterize the climate; there being no prevailing diseases, and the extremes of heat during the summer being checked by sea breezes during the day, and by light airs from the Sierra Nevada during the night. The nights are generally cool and refreshing, as is the shade during the hottest day."[11]

The Plaintiff "is an undergraduate student of the University of Michigan, registered for the Fall 2026 academic term, studying in the honors mathematics program."[12] Compl. ¶ 4, at 3; ECF No. 12, at 4 & n.1. She commenced her case under title 11 in this District on June 8, 2026, Voluntary Pet., *In re Yang*, No. 26-30507 WJL (Bankr. N.D. Cal. June 8, 2026), ECF No. 1, and "returned to Ann Arbor, Michigan from the San Francisco Bay

---

[11] John Charles Frémont, *Geographical Memoir upon Upper California, in Illustration of His Map of Oregon and California, Addressed to the Senate of the United States*, H.R. Misc. Doc. No. 5, 30th Cong., 2d Sess., at 29–30, 39 (1849) (printed under the resolution of January 2, 1849, "That twenty thousand extra copies of Colonel Fremont's last report to the Senate, be printed"; the memoir was first printed as S. Misc. Doc. No. 148, 30th Cong., 1st Sess. (1848)), https://www.loc.gov/item/2024886957/.

[12] kai, *Resolvable 4-GDDs of type $2^u$ exist for all $u \equiv 4 \pmod 6$ except 4 and 10*, Zenodo (Oct. 30, 2026) (second amended manuscript), https://doi.org/10.5281/zenodo.23780513 (at 1, giving the author's affiliations as "Department of Mathematics, University of Michigan, Ann Arbor, MI, USA" and "Student Division, The Federalist Society for Law and Public Policy Studies, Washington, DC, USA").

Area on June 16, 2026, and anticipates potentially significant mailing time to the Clerk's office in San Francisco, California." Decl. of Nadja Yang in Supp. of Mot. for Extension of Time ¶ 1, at 1, *In re Yang*, No. 26-30507 WJL (Bankr. N.D. Cal. June 22, 2026) (executed June 17, 2026), ECF No. 21.

Footnote 1 of the first amended complaint in the adversary proceeding reads: "On his appointment, Mr. Lynch called Stanford 'such a truly unique, special place.' Having 'returned to Ann Arbor, Michigan from the San Francisco Bay Area on June 16, 2026,' 'the [Plaintiff]—albeit residing in Ann Arbor, Michigan—is favorably disposed toward the San Francisco Bay Area, as encompassed by the Northern District of California.' On the desirability of the forum, if on nothing else, the parties appear to have attained delightful alignment." First Am. Compl. ¶ 13 n.1, at 6–7, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Sept. 10, 2026), ECF No. 13 (alteration in original) (citations omitted) (quoting Compl. ¶ 13 n.2, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. July 15, 2026), ECF No. 1 (quoting Chelcey Adami, *Timothy G. Lynch Named Stanford's New General Counsel*, Stanford Report (July 8, 2026)); Decl. of Nadja Yang, *supra*, ¶ 1; and Debtor's Mot. to Alter or Amend Order Dismissing Case for Improper Venue at 7 (Part II), *In re Yang*, No. 26-30507 WJL (Bankr. N.D. Cal. June 29, 2026) (dated June 25, 2026), ECF No. 28 (citing 28 U.S.C. § 84(a))); *see also id.* ¶¶ 9, 27, 31, at 5, 11, 13 ("she made the June 10, 2026 calls to the University's offices from Berkeley, Alameda County, California, and sent her June 10 reply to the correspondence fixing the pre-payment condition from San Jose, Santa Clara County, California").[13]

To be sure, the valley of San Jose was, by the account given the Senate in 1848, "[s]heltered from the cold winds and fogs of the sea," Frémont, *supra*, at 31, where, "open to the bay of San Francisco," the mean temperature from February 13 to 22, 1846 "was 50° at sunrise and 61° at sunset," *id.* at 33 (10.0 and 16.1 °C); the National

[13] The Plaintiff's transaction record for "STARBUCKS STORE 6605," "San Jose, CA," shows a purchase of $7.75 "Authorized" on "Jun 10, 2026" and "Posted" on "Jun 13, 2026," with the terminal location "STARBUCKS STORE 6605, SAN JOSE, CA" (Transaction ID 3592-193551001).

Weather Service's memorandum on the climate of San Jose gives mid-summer highs that "normally range from 80 to 85 degrees" (26.7 to 29.4 °C), "tempered by the sea breeze off the bay," and, under offshore flow, "temperatures can soar to 100 degrees or more during the dry season" (37.8 °C);[14] and on June 10, 2026 the maximum temperature was 31.7 °C at San Jose, 25.0 °C at San Francisco Downtown, and 32.8 °C at Ann Arbor, where 14.5 mm of rain fell; on June 11, 36.7 °C, 31.7 °C, and 30.6 °C.[15]

Counsel for the University of Michigan in the adversary proceeding, Robert C. Folland of Barnes & Thornburg LLP, who signs as "Partner" over "3300 PGA Blvd, Suite 510 Palm Beach Gardens, FL 33410" and "41 S. High Street Suite 3300, Columbus, OH 43215" and a list of the firm's offices that runs from "Atlanta" to "Washington, D.C." by way of "Los Angeles" and "San Diego," fixed a time "by no later than 5:00 p.m. Ann Arbor time this Friday, August 21, 2026," Email from Robert C. Folland to Nadja Yang (Aug. 19, 2026, 15:50 EDT), and wrote on that Friday: "Note there is a court conference in California on September 30 and I will plan to meet you then if we do not communicate before that time." Email from Robert C. Folland to Nadja Yang (Aug. 21, 2026, 14:58 EDT). On the Wednesday following: "I will see you in San Francisco at the end of September so we can start addressing the numerous lawsuits you have filed." Email from Robert C. Folland to Nadja Yang (Aug. 26, 2026, 12:06 EDT).

The summons had set the Scheduling Conference "for 9/30/2026 at 10:30 AM in/via Oakland Room 220 - Lafferty." Summons, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. July 16, 2026), ECF No. 3 (docket text). Amy C. Poyer's first motion to dismiss, stamped "FILED" by the United States Bankruptcy Court on August 17

[14] Miguel Miller, *Climate of San Jose* pt. II (NOAA Technical Memorandum NWS WR-259, 1999), https://www.weather.gov/media/mtr/climate/SJC_CLIMATE.pdf. National Centers for Environmental Information, *U.S. Climate Normals 1991–2020*, annual and seasonal normals for station USW00023293, "SAN JOSE, CA US," https://www.ncei.noaa.gov/data/normals-annualseasonal/1991-2020/access/USW00023293.csv (summer mean maximum 80.5 °F, 26.9 °C; 16.3 days a year with maximum temperature at or above 90 °F, 32.2 °C).

[15] National Centers for Environmental Information, *Daily Summaries*, Access Data Service, stations USW00023293 ("SAN JOSE, CA US"), USW00023272 ("SAN FRANCISCO DWTN, CA US") and USC00200230 ("ANN ARBOR U OF MICH, MI US"), June 10–11, 2026 (maximum temperature and precipitation), https://www.ncei.noaa.gov/access/services/data/v1 (queried Nov. 3, 2026).

and, separately, "FAXED," and captioned "OAKLAND DIVISION," noticed its hearing "on September 30, at 10:30 a.m., or as soon thereafter as the matter may be heard, in Department 220 above [sic] the above-captioned court located at 1300 Clay Street, Oakland, California, 94612," to "be held in person, but parties may attend by Zoom Webinar or AT&T Teleconference." Def.'s Notice of Mot. & Mot. to Dismiss Adversary Proceeding at 1–2, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Aug. 17, 2026), ECF No. 11; *see also* Def.'s Mot. to Dismiss First Am. Compl., *supra*, at 1 (captioned "SAN FRANCISCO DIVISION"; the same sentence). Amy C. Poyer's notice of hearing on the second motion, dated September 28, states that the motion "will be heard on November 4, 2026 at 10:30 a.m. Pacific Time, or as soon thereafter as the matter may be heard, before the Honorable William J. Lafferty III, United States Bankruptcy Judge, at Courtroom 220, 1300 Clay Street, Oakland, California 94612," and that "[t]he hearing will be held in person, with remote attendance available under Judge Lafferty's procedures and the posted calendar for the hearing date." Notice of Hearing on Mot. to Dismiss First Am. Compl. at 1–2, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Sept. 28, 2026), ECF No. 20. On September 30 the Court continued the matters "to 11/04/2026 at 10:30 AM in/via Oakland Room 220 - Lafferty." Minutes of Proceeding, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Sept. 30, 2026) (entered Oct. 1, 2026) (docket text) ("Parties can proceed with discussions."). Mr. Folland's application for admission pro hac vice was filed on September 25 and granted on October 1. Application for Admission of Attorney Pro Hac Vice, *Yang v. Lynch (In re Yang)*, Adv. No. 26-03032 (Bankr. N.D. Cal. Sept. 25, 2026), ECF No. 17 (docket text); Order Granting Application for Admission of Attorney Pro Hac Vice, *id.* (Oct. 1, 2026), ECF No. 21 (docket text).

The opening brief in the appeal from the dismissal of the case under title 11 states: "The Debtor's convenience is the Debtor's to weigh. 'The convenience of the parties' is not a warrant to move a case for the petitioner's own good over the petitioner's objection, and it would be a strange reading that made it one. 'On balance, the Debtor—albeit

residing in Ann Arbor, Michigan—is favorably disposed toward the San Francisco Bay Area, as encompassed by the Northern District of California.'" Appellant's Opening Br. at 31–32, *Yang v. Regents of the University of Michigan (In re Yang)*, No. 3:26-cv-07259-WHO (N.D. Cal. Oct. 5, 2026), ECF No. 8 (quoting Debtor's Mot. to Alter or Amend Order Dismissing Case for Improper Venue, *supra*, at 7 (citing 28 U.S.C. § 84(a))) (citing First Am. Compl., *supra*, ¶ 13 n.1 (quoting Debtor's Mot. to Alter or Amend Order Dismissing Case for Improper Venue, *supra*, pt. II), and Compl. ¶ 13 n.2, *Yang v. Lynch (In re Yang)*, *supra* (same)) (citing, "Cf.," Sharon Waxman, Opinion, *No One Really Wants to Move From Beverly Hills to Nashville*, N.Y. Times (Aug. 15, 2026), https://www.nytimes.com/2026/08/15/opinion/culture/ellison-nashville-paramount-hollywood.html ("the title says it all"), and, "But cf.," Maia, known professionally as mxmtoon ("native of Oakland, California, and Gen Z singer-songwriter, since relocated to Nashville")).

The footnote to that sentence records the route: "Having only just looked out at the Santa Cruz Mountains on the way into Civic Center, AirTrain and then BART, straight off the plane from Denver, at a loss and, at the time, in no great doubt about it, the undersigned was perhaps thoroughly converted at some point proximate to the Waymo rides across the Bay Area, the weather being the entire liturgy; never mind the pilgrimage destinations, invariably disappointing, as such places are, or the abrupt retreat to Ann Arbor on an Apple Pay Clipper balance [from Caltrain Sunnyvale Station] and the alarmingly abundant, pre-existing Delta Air Lines 'eCredits' that could, somehow, still be mustered from a lounge at SFO." *Id.* at 32 n.3. *Cf. Great Lakes Insurance SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 76–77 (2024) (a choice of law is disregarded only where the parties "can furnish no reasonable basis for the chosen jurisdiction," an exception that "must be applied with substantial deference to the contracting parties," since "maritime actors may sometimes choose the law of a specific jurisdiction because, for example, that jurisdiction's law is 'well developed, well known, and well regarded'").

Michigan Flyer, a motorcoach service of Indian Trails, LLC, runs fourteen daily

round trips between Ann Arbor and Detroit Metropolitan Airport, leaving the Liberty Square Garage, 500 East Washington Street, for the McNamara Terminal from 3:20 a.m. to 8:00 p.m., at an advance fare of $16 one way and $27 round trip.[16] The Plaintiff's ticket of June 16, 2026, bought at 6:06 PM for the 11:00 PM departure from the McNamara Terminal, arriving at the Liberty Square Garage at 11:40 PM on the last westbound run of the day, was "USD 16.00."[17] From San Francisco International Airport, the Bay Area Rapid Transit District carries a passenger with a Clipper card to its Civic Center/ UN Plaza station, 1150 Market Street, for $11.80;[18] the Charter of the United Nations was "Done at the city of San Francisco the twenty-sixth day of June, one thousand nine hundred and forty-five";[19] and the courthouse is at 450 Golden Gate Avenue.[20]

Appeals from the reviewable decisions of this Court "shall be taken" to "the court of appeals for the circuit embracing the district," 28 U.S.C. § 1294(1), the United States Court of Appeals for the Ninth Circuit, a circuit of "Alaska, Arizona, California, Idaho, Montana, Nevada, Oregon, Washington, Guam, Hawaii," *id.* § 41, which holds its regular sessions at "San Francisco, Los Angeles, Portland, Seattle." *Id.* § 48(a). Appeals from the Eastern District of Michigan are taken to the United States Court of Appeals for the Sixth Circuit, a circuit of "Kentucky, Michigan, Ohio, Tennessee," *id.* § 41, which holds

[16] Michigan Flyer, *Schedules*, https://web.archive.org/web/20261102002424/https://www.michiganflyer.com/schedule-route; Michigan Flyer, *Fares*, https://web.archive.org/web/20261102002455/https://www.michiganflyer.com/fares.

[17] Michigan Flyer trip summary, Ticket No. 260616953006, DTW McNamara Terminal to Liberty Square Garage, June 16, 2026 (filed herewith) ("Trip summary"; "Ticket no 260616953006"; "DTW McNamara Terminal - Liberty Square Garage Tuesday, 06/16/2026 11:00 PM"; "Arrival: Liberty Square Garage Tuesday, 06/16/2026 11:40 PM"; "Price: USD 16.00"; "Bought on: 6:06 PM 06/16/2026"; "Cart no: 260616719388"); Michigan Flyer, *Schedules*, *supra* (westbound run 8027, the last listed, McNamara Terminal 11:00 PM to Liberty Square Garage 11:40 PM).

[18] San Francisco Bay Area Rapid Transit District, *BART API*, Schedule Information (fare, SFIA to CIVC) and Station Information, https://api.bart.gov/ (queried Nov. 1, 2026).

[19] U.N. Charter, June 26, 1945, 59 Stat. 1031, 1054, https://www.govinfo.gov/content/pkg/STATUTE-59/pdf/STATUTE-59-Pg1031.pdf.

[20] ECF No. 12, at 2. The City and County of San Francisco's Enterprise Addressing System records the address, under the landmark name "Phillip Burton Federal Building and United States Courthouse," in the analysis neighborhood "Tenderloin." City and County of San Francisco, *San Francisco Addresses —Enterprise Addressing System* (dataset 3mea-di5p, EAS address ID 682089, record for 450 Golden Gate Ave), https://web.archive.org/web/20261103070123/https://data.sf.gov/resource/3mea-di5p.json?eas_address_id=682089.

its regular sessions at "Cincinnati." *Id.* § 48(a).

## 3 Conclusion

The order to show cause should be discharged, and the motion for a preliminary injunction heard as set. ECF Nos. 12, 13. This Court has personal jurisdiction over the Regents of the University of Michigan, Part 1; venue is proper in this District, Section 2.1; and the action should not be transferred, Section 2.2. Should the Court conclude that venue is improper, the Plaintiff asks that the action be dismissed under 28 U.S.C. § 1406(a) rather than transferred, so that the question may be reviewed by the United States Court of Appeals for the Ninth Circuit; and should the Court order a transfer under 28 U.S.C. § 1404(a), she asks that the order be stayed for a period sufficient to permit a petition for a writ of mandamus, 28 U.S.C. § 1651(a), or be certified under 28 U.S.C. § 1292(b).

Dated: November 3, 2026

Respectfully submitted,

/s/ kai

KAI, also known as Chi, Plaintiff *pro se*

`Assisted-by: Claude Fable 5.1 via Claude Code`